UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | |
| FRANK OLIVARRIA : | Case No. 26-mj-42 |
| : | |
| Defendant. : | |
| : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its request that defendant Frank Olivarria be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A). Mr. Olivarria is charged with Distribution of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2), (b)(1). Distribution of Child Pornography is a crime of violence, and there is no condition or combination of conditions that will reasonably assure the safety of children in the community if he is released. As detailed below, an analysis of the factors set forth in 18 U.S.C. § 3142 leads to the conclusion that detention is the only way to protect children in the community.

**FACTUAL BACKGROUND**

A.   Chats with Undercover Officer

On August 1, 2025, an FBI Task Force Officer ("TFO") assigned to the Washington Field Office ("WFO") was acting in an undercover capacity (hereinafter "UC") on an online dating application. The UC was operating out of a satellite office in Washington, D.C. The UC's dating profile displayed the following hashtags: #daddyson, #nolimits, #tabbboo, and #tabbo.[1]

---

[1] The terms "No limits" and "taboo" are common references to child exploitative material.

On August 1, 2025, the dating application user "Frank" (later identified as Frank Olivarria) sent a direct message to the UC stating, "How's it going man?" Mr. Olivarria's profile indicated that he was 5'8" in height, 185 lbs, of Hispanic or Latino heritage, and single. The dating application displayed Mr. Olivarria's location as being five miles away from the UC and listed that he lived in Temple Hills, Maryland. Additionally, his profile contained numerous selfie-style pictures, showing a Hispanic male with dark hair, a beard, glasses, and a nose ring. Mr. Olivarria's dating application profile listed his Instagram username as @frankaolivarria. Mr. Olivarria's profile indicated that he "Would like to make friends, maybe dates even. Hookups happen, when they do- prefer to be orally serviced [purple devil emoji]."

On August 13, 2025, the UC responded to Mr. Olivarria, stating "Hey not much, how are you today?" On September 7, 2025, Mr. Olivarria wrote, "Hey, sorry rarely use these apps!" and "Def liked your tags! [purple devil emoji]." The UC asked for Mr. Olivarria's Telegram handle and OLIVARRIA provided his handle as @guyhere0t9. Mr. Olivarria further added, "Damn you're close. Would love to have perv friends IRL.[2]"

On September 8, 2025, the UC messaged the Telegram handle provided by Mr. Olivarria, @guyhere0t9, stating, "Hey, from [Dating application]. Nice to meet another perv [purple devil emoji]." Mr. Olivarria's Telegram username was "H Guy" and his profile picture was a cartoon image of a man in a football jersey with the number "94" and the name "Estes" written above it. The number 94 and the name "Matt Estes" are a reference to a known child sexual abuse material (CSAM) series depicting an adult male sexually abusing an infant male. The next day, Mr. Olivarria greeted the UC, advised that he was about to masturbate, and wrote, "Proud pedo perv

---

[2] "IRL" is known to be an abbreviation for "In real life."

penis here man."[3] On the same day, the UC responded, "Mmmmmm morning pedo friend… How was your jerk sesh." On September 10, 2025, Mr. Olivarria replied, "Love that word. It was short last night tbh. But always damn good to please my pedo penis."

On September 23, 2025, Mr. Olivarria advised that his notifications were off on his phone and, as a result, he kept missing the UC's messages. He added, "I should be more responsive soon. I love connecting to pervs, specifically boy loving pedos man." On September 25, 2025, in response to the UC asking his age preference, Mr. Olivarria advised, "I really like cute toddlers man. Like 3-7 turns me the fuck on. But shit anything single digit and less."

On December 9, 2025, Mr. Olivarria messaged the UC, "Yo. Sorry man. Went MIA. Went to get some treatment for cocaine addiction. Still a perv though man." Mr. Olivarria further added, "I've been a perv a very long time…" Mr. Olivarria explained that he had "dropped cocaine at work oops" and that he "got in front of it" by going to rehab before his employer suggested that he do so. Mr. Olivarria stated that his employer was "sweeping it under the rug, is my impression" and that he was trying to get himself "fixed up and focused," but "the perv part I'm not trying to rehab."

On December 12, 2025, the UC told Mr. Olivarria that he had a nine-year-old son. In response, Mr. Olivarria said that he was fantasizing and masturbating about the UC's son and that he imagined that the UC was teaching his son "how to be a good boy and how to be proud in the way only boys and later men can be proud."

---

[3] "Pedo" is short for pedophile.

On December 9, 2025, the UC opened the Telegram Secret Chat[4] application and observed that Mr. Olivarria, using the same Telegram handle described above, @guyhere0t9, sent five CSAM videos to the UC on December 9, 2025, which are described below:

    a.    An approximately nine-second-long video showing an adult penis penetrating the mouth of a male toddler;

    b.    An approximately 18-second-long video showing an adult penis penetrating the mouth of a small, pre-pubescent boy. The adult male's hand is moving the child's head up and down while his penis is inserted in the boy's mouth;

    c.    An approximately one minute and six-second-long video showing an adult penis penetrating the anus of a pre-pubescent boy, who is nude and visible from the chest down;

    d.    An approximately six minute and 52-second-long video showing an adult hand pulling back the pajamas and underwear of a small boy who appears to be asleep. The adult hand then masturbates the child's penis;

    e.    An approximately 14-second-long video showing an adult male rubbing his penis against the anus of a small male child. The child is nude, on his knees, and is only visible from behind.

Mr. Olivarria suggested that he and the UC talk using the Secret chat since the UC had "experience" sexually abusing his child. Mr. Olivarria further stated, "I don't. Wish I did. Always

---

[4] According to Telegram's Support page, tsf.telegram.org, Telegram Secret Chats use End-to-End Encryption. Secret Chats are a bundle of tools for private single-device communication. They are self-sanitizing due to self-destruct timers, and users cannot forward messages from them. Secret chats are only available on their devices of origin.

4

imagined I'd raise my own baby boy on my loads and perv penis though. Gets me hard just typing it. Maybe homeschool. Me and a o other perv dad. But it could just be a sick fantasy [emojis]."

On December 12, 2025, Mr. Olivarria sent several videos and an image of his erect penis to the UC over the Secret Chat with the text, "Thinking of my new perv friend." He told the UC that he was "fortunate" to live vicariously through other "pervs" for now, but that he was "looking for real life friends too" and "did not want to scare a dad off. And I want to respect boundaries and let things naturally flow." Mr. Olivarria then stated that he was tired of "internet only and being able to disappear."

The UC told Mr. Olivarria that he had divorced his wife when his son was six years old. In response, Mr. Olivarria stated, "Dude I love that you base it on his age. I imagine you can imagine what that made my blood do [emojis]. Shows me the way your mind thinks. Not the year, not your age…his age. He must be really important to you [heart emojis] (I got absolutely bricked again)."[5] Mr. Olivarria told the UC that, in terms of their sexual interest in children, he liked to think that "we aren't so different [from other men], that we think like most of the world's men but that we suppress it because of society. That how we think comes more naturally than the world likes to admit."

On December 13, 2025, Mr. Olivarria sent the UC an approximately 22-second-long video of a small, pre-pubescent boy, who is nude and lying on his stomach, with his anus and genitals displayed toward the camera.[6] An adult male is lying next to him on the bed, and the adult male is

---

[5] Bricked is slang for having a visible erection.

[6] This message, and the remainder of the messages described herein, were all sent by Mr. Olivarria over the Secret Chat function.

touching the child's buttocks and inserting his finger into the child's anus. An additional adult male hand is seen touching the child's buttocks and displaying the child's anus for the camera. On December 16, 2025, in reference to the video described above, Mr. Olivarria wrote, "So hot. The tiny boy butt. Handsome perv with a smile and those smooth little boy testes [drooling face emoji]."

On December 17, 2025, the UC wrote to Mr. Olivarria, "Mmmmmm hey perv." Mr. Olivarria responded, "Hey hey… Just logged in to check if you had blessed me with anything bahaha. About to head to my little part time job." Mr. Olivarria sent a video presumably of himself masturbating his penis. The UC responded, "Great pedo cock" and sent two images, the first of which showed an adult male hand raising the shirt of a child to reveal the child's naked stomach and underwear.[7] The second image showed a pair of children's underwear on a chair and an adult male penis above them. In response, Mr. Olivarria stated, "Oh my fucking godddd. That first pic…!!! I love it [heart emojis]. Great cock too."

On December 18, 2025, Mr. Olivarria sent an approximately one minute and 38-second-long video of a nude, pre-pubescent boy with his anus and genitals displayed toward the camera. An adult hand is seen touching the child's buttocks and displaying the child's anus for the camera. On the same day, the UC responded, "Fucking hot bro… You like what you see with mine?... He looks a bit like what you sent [purple devil emoji]." Mr. Olivarria replied, "Fuck he's I do. You know it man." Mr. Olivarria then sent three heart-eye smiling face emojis and the text, "That's beautiful man. Had me blowing thinking about yours."

On December 22, 2025, the UC wrote, "Hey friend…You had a good stroke thinking about his tiny body [purple devil emoji]." On December 28, 2025, Mr. Olivarria responded, "Fuck

---

[7] The images sent by the UC did not depict a real child or a real penis.

yessssss yes yes yes bro…Just seeing this man. I totally enjoyed my Stroke. Perv stroke. Little body. Tiny boy undies. Tiny sweet white boy butt."

On January 6, 2026, Mr. Olivarria replied again to the December 17 image sent by the UC that showed the UC lifting the shirt of his purported son, writing, "I want more bro" with three purple devil emojis. Mr. Olivarria then sent an approximately one minute and 21 second-long video of a nude, pre-pubescent boy with his hands handcuffed behind his back, with a ski mask over his face covering everything but his mouth. The child is sitting on a bed, and a nude adult male is on his knees next to the boy, inserting his penis into the child's mouth. The male is then seen sitting on the bed and forcing the child's mouth onto his penis, while the child's hands are still handcuffed behind his back. The adult male then inserts his penis into the child's anus, while the child's hands are tied to his legs.

B.  Identification of Frank Olivarria

Mr. Olivarria's dating application profile listed his Instagram account as @frankaolivarria. Open source queries for the name "Frank Olivarria" and Temple Hills, Maryland revealed an individual named Frank Anthony Olivarria, date of birth 05/19/XXXX (redacted), at the address XXXX Deer Park Drive, Temple Hills, MD 20748 (redacted). Queries of Department of Motor Vehicle records revealed that Mr. Olivarria has an Arizona driver's license, which indicates he is 5'9" and 185 lbs, and lists his residence as XXXX E Desert Straw Lane (redacted), Tuscon, Arizona, and his primary contact address as XXXX Deer Park Dr Bsmt[8] (redacted), Temple Hills, Maryland. Mr. Olivarria's driver's license photograph depicts the same individual as the individual in the dating application profile pictures for "Frank" described above. Additionally, the profile

---

[8] Short for basement.

picture of the Instagram account @frankolivarria depicts the same individual as on the dating application profile for "Frank."

Mr. Olivarria's criminal history report revealed he was arrested on September 10, 2025, by the D.C. Metropolitan Police Department (MPD) for Possession of a Controlled Substance and given a citation. On September 10, 2025, MPD officers were called to the Department of Health and Human Services, located at 200 Independent Ave SW Washington, DC 20201, where Mr. Olivarria, a federal employee working with the Federal Drug Administration (FDA), was observed on video dropping a clear bag containing a white substance near the children's playground adjacent to the exterior of the facility. The substance was field-tested and determined to be cocaine, and Mr. Olivarria was subsequently arrested by MPD. However, no charges were ultimately filed. This aligns with Mr. Olivarria's December 9, 2025, statement to the UC that he had recently gotten treatment for a cocaine addiction after having dropped cocaine at work.

On January 19, 2026, in response to an administrative subpoena for the Instagram account @frankaolivarria, Meta Platforms, Inc. provided a verified telephone number of 520-425-XXXX (redacted) and a verified recovery email address of fXXXXXXXXXXXXX@gmail.com (redacted).

On January 28, 2026, a query of United States Postal Inspection Service records revealed that thirty packages were received at the Deer Park Drive address by Frank Olivarria between January 28, 2025, and January 28, 2026, with the most recent package received on January 20, 2026. Twenty-seven of the thirty packages were delivered to the basement unit of the residence.

In February 2026, surveillance was initiated on the Deer Park residence. Mr. Olivarria's known vehicle, a 2017 Kia Sportage displaying Arizona tag MMA2ZK, which is registered to him,

8

was observed in the driveway on several occasions between February 3, 2026, and February 12, 2026.

On February 11, 2026, in response to an administrative subpoena, T-Mobile USA provided subscriber information for phone number 520-425-XXXX (redacted) as "Frank Olivarria" at the address XXXX E Desert Straw Ln Tucson, AZ 85756 (redacted).[9] Your affiant knows that Mr. Olivarria previously resided in Arizona, has an Arizona driver's license, and has an Arizona tag on his vehicle.

C.   Additional Information

Mr. Olivarria continued chatting with the UC through March 1, 2026. He informed the UC that he had a new boyfriend but was still masturbating to child sexual abuse material at night.

On March 2, 2026, Mr. Olivarria was arrested in Maryland at the residence of his boyfriend and charged with one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), (b)(1).

On March 5, 2026, Mr. Olivarria's boyfriend called law enforcement and reported that he had located a blue Apple iPad which belonged to Mr. Olivarria in Mr. Olivarria's backpack at the residence. The boyfriend stated that he had logged into the iPad and observed several "disturbing and inappropriate" images and text messages. He further stated that the iPad contained a video in which Mr. Olivarria is masturbating while watching a video of another man masturbating to an image of a clothed child. According to the boyfriend, Mr. Olivarria can be heard encouraging the other man, saying, "that's my beautiful nephew" and directing him to "cum on my beautiful nephew's face." Mr. Olivarria's boyfriend stated that the boy in the photograph was a seven-year-

---

[9] This matches the same phone number and address listed previously.

child known to both him and Mr. Olivarria. The boyfriend agreed to cease his review of the iPad and provided the iPad to law enforcement.

## APPLICABLE LEGAL STANDARD

Mr. Olivarria is charged with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), (b)(1), a crime of violence. 18 U.S.C. § 3156(c) defines a "crime of violence" to include violations of Title 110, under which § 2252(a)(2) falls. Further, § 2252(a)(2) gives rise to a rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(E), where it is to be *presumed* that no combination of conditions will protect the community or assure the defendant's return. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"); *see also United States v. Hir,* 517 F.3d 1081, 1086 (9th Cir. 2008). Even if the defendant does not pose a flight risk, danger to the community by itself is a sufficient reason to order pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the

10

court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## ANALYSIS

Mr. Olivarria poses a significant danger to children in the community. For the reasons addressed below, the factors outline in 18 U.S.C. § 3142(g) weigh in favor of detention and he cannot rebut the presumption of detention.

### A.  Nature and Circumstances of the Charged Offense

Mr. Olivarria's conduct is extremely serious. He distributed eight videos of child sexual abuse material to an undercover officer, including videos showing the rape of prepubescent children and one video where the child was raped while blindfolded and handcuffed. Further, Mr. Olivarria encouraged the UC's sexual abuse of his purported son, whom Mr. Olivarria believed was a real 9-year-old boy, and even requested that the UC send him additional photographs of the child.

As Chief Judge Boasberg noted in considering the government's appeal of the magistrate court's release order in *United States v. Reid*, 25-cr-311 (JEB), it is important to consider where a

11

particular defendant's behavior falls on the spectrum of conduct commonly seen in child exploitation cases. At one end of the spectrum are individuals who distribute a single image of child pornography. At the other end are defendants who engage in hands-on abuse of a child or run forums dedicated to trading child pornography. Here, Mr. Olivarria's conduct falls towards the middle of the spectrum. He distributed multiple videos of extremely graphic CSAM to the UC. And, his conduct was not limited to exchanging anonymous material online: he actively encouraged the hands-on abuse of what he believed was a real boy and even requested that the UC send him additional photographs of the abused child so that he could masturbate over them.

Mr. Olivarria's conduct demonstrates that he poses a danger both to children in the physical world, as well as to children who are suffering the aftermath of having images of their sexual abuse distributed online. Children depicted in sexually explicit images and videos are victimized at the time the images were created, and they are re-victimized each time an individual, like the defendant, views the images for their own sexual gratification. As explained by the Sixth Circuit in a child pornography case:

> ...we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of…children who are forced into these roles.
>
> ...every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-122 (6th Cir. 2011) (quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers

and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

Congress has recognized the serious nature of crimes involving child pornography and the long-term damage that these crimes can cause by specifying that these crimes carry a rebuttable presumption of detention and, in the case of distribution of CSAM, a five-year mandatory minimum sentence. *See* 18 USC § 2252(b)(1). Here, Mr. Olivarria distributed eight videos showing the rape and sexual abuse of young boys and encouraged the ongoing abuse of what he believed was another child. Thus, this factor weighs in favor of detention.

### B.   The Weight of the Evidence Against the Defendant

The weight of the evidence against Mr. Olivarria is strong. The government is in possession of the chats between Mr. Olivarria and the UC, which are the evidence of the defendant's criminal conduct. The material sent in the chats clearly qualifies as CSAM. Nor is there any serious question as to the identity of the sender. The dating profile account used to contact the UC contained photos of Mr. Olivarria as well as his known Instagram profile. The conversations with the UC referenced personal information consistent with that of Mr. Olivarria, including the particular details of his recent arrest. Moreover, the video seen by Mr. Olivarria's boyfriend, in which Mr. Olivarria encourages another man to ejaculate on a photo of a child, corroborates Mr. Olivarria's sexual interest in children. Thus, this factor also weighs in favor of detention.

### C.   History and Characteristics of the Defendant

Mr. Olivarria was arrested and given a citation for a Possession of Cocaine in September 2025. According to the arrest report – which is corroborated by Mr. Olivarria's own statements to the UC – on September 10, 2025, a bag containing suspected cocaine was found on the grounds of the Food and Drug Administration (FDA), next to a children's playground. Video footage from

the previous day showed Mr. Olivarria walking towards the entrance of the building and the bag falling out of his coat pocket. According to Mr. Olivarria's statements to the UC, he went to treatment for his cocaine use to avoid adverse employment consequences, but he has not sought, nor has any intention of seeking, treatment for his sexual interest in children or use of child pornography – as he stated, "the perv part I'm not trying to rehab." These statements show that Mr. Olivarria fundamentally believes that his conduct is acceptable and that he views children as merely objects for him and others to exploit and abuse for their own sexual gratification.

Moreover, the present offense does not represent a mistake or lapse in judgement, but rather one instance in a pattern of criminal behavior. Mr. Olivarria's statements to the UC, as well as the CSAM which he distributed, show a clear preference for young boys and his willingness to overtly seek out this type of content. By his own account, he has "been a perv for a very long time" and has pursued connections with other "boy-loving pedos."

In short, Mr. Olivarria's limited criminal history does not accurately portray his history of criminal conduct. Thus, to the extent his lack of criminal convictions weighs in his favor, it does not do so strongly.

### D.     The Nature and Seriousness of the Danger to Any Person or the Community

Finally, the sexual exploitation of children presents a serious danger to the community, which results in severe mental, emotional, and physical trauma to the countless children who are victimized by offenders like Mr. Olivarria and others with a demonstrated sexual interest in children. It is this type of harm that led Congress to create the statutory presumption of detention in these cases and to provide for a mandatory minimum sentence if convicted.

That child pornography offenses are serious is a fact noted by the Supreme Court. At least as early as the landmark decision, *New York v. Ferber*, 458 U.S. 747 (1982), the Supreme Court

referenced numerous research materials detailing the harm to children as a result of the production and trafficking of child pornography.

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography."

Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981). *See also* Child Exploitation 292 ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U.Mich.J. Law Reform 295, 301(1979) (interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). 4 58 U.S. 758, n.9.

> Moreover, as the Eastern District of New York has found:
>
> ...the issue is not only defendant's potential abuse of children and his interaction with children if on bail, but also his ability, if he is released on bail, to attempt to possess additional child pornography, or to communicate and interact with (via email, internet, or phone) others involved in the possession, sale, and distribution of child pornography or other sexual abuse of children, which would also create a clear danger by facilitating the criminal and dangerous exploitation of children by other individuals.

*United States v. Reiner*, 468 F.Supp.2d 393, 397 (E.D.N.Y. 2006). The *Reiner* court further found that there were no conditions in that case that could reasonably assure the safety of the community "[i]n this day and age, with devices such as cellphones, Blackberries, and laptops..." *Id.* at 399.

Here, moreover, Mr. Olivarria's conduct was not limited to trafficking CSAM online. As discussed above, he encouraged the sexual abuse of what he believed was a real child and, according to his boyfriend, he also encouraged another man to masturbate to the photograph of a

15

child known to him. He also indicated to the UC that he was seeking to move beyond Internet chats and meet other offenders "in real life." And, he is well-versed in how to hide his criminal activity, as demonstrated by his use of a self-destructing message function to share CSAM with the UC and engage in more explicit conversation. Thus, the risk that Mr. Olivarria poses to children in the community is significant and weighs heavily in favor of detention.

## CONCLUSION

For all of the reasons set forth above, Mr. Olivarria has not rebutted the presumption in favor of detention. The applicable statutory factors compel the conclusion that he should be detained pending trial.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By: */s/ Caroline Burrell*
Caroline Burrell
CA Bar No. 283687
Assistant United States Attorney
601 D St NW
Washington, DC 20530
(202) 815-8613
Caroline.burrell@usdoj.gov